Slip Op. 07-58

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

SAN VICENTE CAMALU SPR DE RI,      :

                     *Plaintiff*,      :

      v.                      :

UNITED STATES,      

                   *Defendant*,      :        Court No. 02-00811

      and                    :

CAADES SINALOA, A.C., et al.,      :

        *Defendant-Intervenors*.      :

_____

[Plaintiff's Motion for Judgment on the Agency Record is denied; Determination of U.S. Department of Commerce suspending antidumping investigation is sustained.]

Dated: April 17, 2007

      Crowell & Moring LLP (Matthew P. Jaffe, Robert A. Lipstein, and Grace W. Lawson), for Plaintiff.

      Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Kent G. Huntington); Augusto A. Guerra and Carrie Owens, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

## OPINION

RIDGWAY, Judge:

      In this action, Plaintiff San Vicente Camalu SPR de RI ("SVC") contests the 2002 Suspension Agreement between the U.S. Department of Commerce and certain growers/exporters of fresh tomatoes from Mexico. *See* Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico, 67 Fed. Reg. 77,044, 77,045 (Dec. 16, 2002) ("Notice of 2002 Suspension

Agreement").  SVC contends that the 2002 Suspension Agreement is unlawful, because the timing

of that agreement was not consistent with the 1997 amendments to the Commerce Department

regulations governing such agreements.

Pending before the Court are Plaintiff's Motion for Judgment on the Agency Record and

supporting briefs, which urge that this matter be remanded to Commerce with instructions to

immediately rescind the 2002 Suspension Agreement and to issue the Final Determination in the

underlying antidumping investigation forthwith.  *See generally* Memorandum of Points and

Authorities in Support of San Vicente Camalu's Motion for Judgment on the Agency Record ("Pl.'s

Brief"); Reply Memorandum in Response to Defendant's Memorandum in Opposition to Plaintiff's

Motion for Judgment on the Agency Record ("Pl.'s Reply Brief"); Plaintiff's Surreply Brief in

Response to Defendant's Surreply  ("Pl.'s Surreply Brief").

The Government opposes Plaintiff's motion.  The Government disputes SVC's fundamental

premise, the applicability of the regulations as amended in 1997.  According to the Government, the

negotiation of the 2002 Suspension Agreement was subject to – and complied with – Commerce's

1996 regulations, which set a more relaxed timetable for suspension agreements, and required only

that any such agreement be concluded before the deadline for issuance of the agency's Final

Determination in the underlying antidumping investigation.  *See generally* Defendant's

Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Def.'s

Brief"); Defendant's Surreply in Response to Plaintiff's Reply Brief ("Def.'s Surreply Brief").[1]

---

[1]Defendant-Intervenors Confederacion de Asociaciones del Estado Sinaloa, A.C. ("CAADES"), Consejo Agricola de Baja California, A.C., Asociacion Mexicana de Productores de Hortalizas de Invernadero, A.C., Union Agricola Regional de Sonora, Productores de Hortalizas

For the reasons set forth below, SVC's Motion for Judgment on the Agency Record is denied, and the Commerce Department's 2002 suspension of the resumed antidumping investigation of fresh tomatoes from Mexico is sustained.

## I. **Background**

The gravamen of SVC's complaint is that – some eleven years after the Commerce Department began its antidumping investigation of fresh tomatoes from Mexico – the agency has yet to issue its Final Determination in that investigation. The investigation has been twice put on "hold" for years, pursuant to suspension agreements between Commerce and growers/exporters of Mexican tomatoes, to which SVC has not been a party. Moreover, because SVC is not a party to the 2002 Suspension Agreement now in place, the Mexican government will not permit SVC to export its produce to the United States.[2] If the 2002 Suspension Agreement is rescinded and Commerce's Final Determination issues in the resumed antidumping investigation (with findings comparable to those in the Preliminary Determination), SVC expects that it would benefit from a relatively low

Frutas y Legumbres, and Confederacion Nacional de Productores de Hortalizas are trade associations and signatories of the 2002 Suspension Agreement. *See* Notice of 2002 Suspension Agreement, 67 Fed. Reg. at 77,048.

Defendant-Intervenors filed no briefs in this matter; nor did they participate in oral argument, or otherwise play an active role in the litigation.

[2] The precise nature of the Mexican government's prohibition is not detailed in the record. However, the existence of the prohibition has been alluded to by both SVC and the Government, and does not appear to be in dispute. In addition, SVC's Amended Complaint avers that it was "notified directly by the Government that SVC will be stopped from exporting fresh tomatoes to the United States unless it signs the suspension agreement." *See* Transcript of Oral Argument ("Tr.") at 25-26, 47-48, 83; Amended Complaint ¶¶ 12-13.

dumping margin (as compared to those of other Mexican growers/exporters), and presumably would be able to capitalize on that fact and enjoy a competitive advantage in the U.S. market.

The antidumping investigation of fresh tomatoes from Mexico was initiated in mid-April 1996. *See* Initiation of Antidumping Duty Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 18,377 (April 25, 1996). In mid-May 1996, the International Trade Commission ("ITC") made an affirmative preliminary injury determination. *See* Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608, 56,608 (Nov. 1, 1996) ("Notice of AD Preliminary Determination") (noting ITC affirmative preliminary injury determination). But, several weeks before Commerce was due to issue its Preliminary Determination in the antidumping investigation, Commerce and certain Mexican tomato growers/exporters – not including SVC – initialed a proposed suspension agreement. *See* Notice of AD Preliminary Determination, 61 Fed. Reg. at 56,608.

As the name suggests, a suspension agreement is an agreement between Commerce and foreign exporters accounting for "substantially all" U.S. imports of the subject merchandise, "suspending" an antidumping or countervailing duty investigation based on specific commitments by the foreign signatories. In essence, a suspension agreement is "a unique form of settlement agreement: a settlement agreement to which the complainant – that is, the domestic industry – is not a signatory." *See* Bethlehem Steel Corp. v. United States, 25 CIT 519, 520 & n.5, 521-23, 146 F. Supp. 2d 927, 928-29 & n.5, 930-32 (2001) ("Bethlehem Steel I") (*citing* Senator Heinz, 125 Cong. Rec. 20,168 (1979), and generally outlining provisions of suspension agreement statute). Although they are intended to be used only rarely, Congress has recognized that, in appropriate cases, such

agreements may be important to both importers and the domestic industry as a "means of achieving the remedial purposes of the [antidumping] law in as short a time as possible and with a minimum expenditure of resources by all parties involved."  H. Rep. No. 96-317 at 63 (1979) (*quoted in* Bethlehem Steel I, 25 CIT at 522, 146 F. Supp. 2d at 931).[3]

The controversy in this case focuses not on the 1996 Suspension Agreement, but on the second suspension agreement – the 2002 Suspension Agreement – and on the applicability of the 1996 version of the pertinent regulations *versus* those regulations as amended in 1997.  Like the suspension agreement statute (both then and now), the regulations in place in 1996 permitted Commerce to enter into a suspension agreement as late as the deadline for issuance of its final determination (provided that interested parties had 30 days' advance notice and an opportunity to comment on the proposed suspension agreement).  *See* 19 U.S.C. § 1673c(e); 19 C.F.R. § 353.18 (1996).  But the amended regulations greatly accelerate the schedule for negotiation of suspension agreements.

As amended in 1997, Commerce's regulations require that any suspension agreement be concluded early in an investigation, to maximize the potential resource savings associated with the agreement, and – in particular – to avoid the "enormous burden on parties and on the Department [of Commerce]" inherent in the simultaneous consideration of a proposed agreement and the

---

[3]*See also* H. Rep. No. 96-317 at 65 (advantages of suspension agreements include "the expenses saved because of prompt settlement of a case" and "the certainty of prompt relief"); S. Rep. No. 96-249 at 71, *reprinted in* 1979 U.S.C.C.A.N. 381, 457 (suspension agreements "permit rapid and pragmatic resolutions of antidumping duty cases"); Statement of Administrative Action for Trade Agreements Act of 1979, H.R. Doc. No. 96-153, Part II at 420, *reprinted in* 1979 U.S.C.C.A.N. 665, 689 (suspension agreements have "the value of settling the case quickly" and "the certainty of prompt relief").

preparation of a final determination.  *See* Bethlehem Steel Corp. v. United States, 25 CIT 895, 906

n.24, 916 & n.42, 159 F. Supp. 2d 730, 742 n.24, 751 & n.42 (2001) (*quoting* Antidumping Duties;

Countervailing Duties: Notice of Proposed Rulemaking, 61 Fed. Reg. 7308, 7316 (Feb. 27, 1996)[4];

*citing* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,312 (May

19, 1997)) ("Bethlehem Steel II").  Specifically, the amended regulations require that Commerce

give notice of a proposed suspension agreement no later than 30 days after issuance of its preliminary

determination, and that any such agreement be concluded no later than 60 days after the preliminary

determination.  19 C.F.R. § 351.208 (1998).

On October 28, 1996, Commerce finalized and signed the 1996 Suspension Agreement with

growers/exporters accounting for substantially all U.S. imports of fresh tomatoes from Mexico.  *See*

Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 56,618 (Nov.

1, 1996).  SVC was not a party to that agreement.  *Id.*

That same day – October 28, 1996 – was the deadline for issuance of Commerce's

Preliminary Determination in the antidumping investigation.  Like the ITC before it, Commerce too

made an affirmative Preliminary Determination, concluding that imports of fresh tomatoes from

Mexico were being sold in the United States at less than fair value.  *See* Notice of AD Preliminary

Determination, 61 Fed. Reg. at 56,608.

In its Preliminary Determination, Commerce found that – of the six mandatory respondents

---

[4]Commerce's Notice of Proposed Rulemaking further noted that advancing the timeline for consideration of proposed suspension agreements would "reduce burdens on all parties by eliminating the need to file case briefs, rebuttal briefs, and to participate in a hearing, if a suspension agreement is accepted."  *See* Antidumping Duties; Countervailing Duties: Notice of Proposed Rulemaking, 61 Fed. Reg. at 7316.

in the antidumping investigation – SVC had the lowest dumping margin, by far.  SVC's margin was

calculated to be 4.16%.  The margins of the other five mandatory respondents ranged from 10.26%

to a high of 188.45%; and the "All Others" rate was calculated at 17.56%.  *See* Notice of AD

Preliminary Determination, 61 Fed. Reg. at 56,615.   But the Preliminary Determination was

overshadowed by the 1996 Suspension Agreement, which brought the antidumping investigation to

an abrupt and protracted halt.

Fast forward five years, to October 2001, when Commerce published notice of its intent to

conduct a five year "sunset" review of the suspended antidumping investigation.  *See* Notice of

Initiation of Five-Year Review [of Suspended Antidumping Investigation of Fresh Tomatoes From

Mexico], 66 Fed. Reg. 49,926 (Oct. 1, 2001).[5]

Commerce published its Preliminary Results in the sunset review in late January 2002,

concluding that "termination of the suspended antidumping duty investigation . . . would be likely

to lead to continuation or recurrence of dumping."  *See* Preliminary Results of Five-Year Sunset

Review of Suspended Antidumping Duty Investigation: Fresh Tomatoes From Mexico, 67 Fed. Reg.

4237, 4237 (Jan. 29, 2002) ("Notice of Sunset Review Preliminary Results").   And, once again,

Commerce found that – of the six mandatory respondents in the antidumping investigation – SVC

had the lowest dumping margin, by far.  SVC's margin was calculated to be 4.16%.  The other

---

[5]The statute requires that antidumping measures – including suspension agreements, as well as antidumping orders – be reviewed at least every five years, to determine whether the measures should be terminated ("sunsetted").   Where the measure at issue is a suspension agreement, Commerce and the ITC use these "sunset" reviews to analyze whether termination of the suspended investigation "would be likely to lead to continuation or recurrence of dumping . . . and of material injury." 19 U.S.C. § 1675(c)(1)(2000). *See generally* Comm. for Fairly Traded Venezuelan Cement v. United States, 372 F.3d 1284, 1286-87 (Fed. Cir. 2004).

mandatory respondents' margins ranged from 10.26% to 188.45%; and the "All Others" rate was calculated at 17.56%.  *See* Notice of Sunset Review Preliminary Results, 67 Fed. Reg. at 4238.

As the due date for issuance of Commerce's Final Results in the sunset review approached, Commerce announced that it was extending the deadline to late August 2002.  In two separate sections of the relevant Federal Register notice, Commerce attributed its need for additional time to the "ongoing re-negotiation of the [1996] suspension agreement on tomatoes from Mexico."  *See* Fresh Tomatoes from Mexico: Extension of Time Limit for Final Results of Five-Year Sunset Review, 67 Fed. Reg. 35,099 (May 17, 2002).

Several weeks later, in late May 2002, Mexican growers/exporters accounting for a large percentage of U.S. imports of fresh tomatoes notified Commerce that they were withdrawing from the 1996 Suspension Agreement.  The effect of those withdrawals would be to terminate the 1996 Suspension Agreement (as of July 30, 2002), and – in turn – to terminate the sunset review of the suspended investigation (thus avoiding a final determination in the sunset review).  *See* Fresh Tomatoes From Mexico: Notice of Intent to Terminate Suspension Agreement, Intent to Terminate the Five-Year Sunset Review, Intent to Resume Antidumping Investigation, and Request for Comments on the Use of Updated Information, 67 Fed. Reg. 43,278 (June 27, 2002) ("Notice of Intent to Terminate Suspension Agreement & Sunset Review, and to Resume AD Investigation").[6]

In light of the impending terminations of both the 1996 Suspension Agreement and the

---

[6]With those withdrawals, the 1996 Suspension Agreement no longer met the statutory requirement that such agreements cover "substantially all" U.S. imports of subject merchandise, requiring termination of the agreement – which, in turn, resulted in the termination of the sunset review as well.  *See* Notice of Intent to Terminate Suspension Agreement & Sunset Review, and to Resume AD Investigation, 67 Fed. Reg. at 43,279.

related sunset review, Commerce prepared to resume the antidumping investigation that had been

stalled since 1996.  But, acknowledging "the significant lapse of time since initiation of the

investigation," Commerce invited comments as to whether it should obtain "updated information,"

or whether it should complete the investigation based on the record that it had compiled in 1996.

*Id*., 67 Fed. Reg. at 43,279-80; *see also id*., 67 Fed. Reg. at 43,278 (Summary).  And, in a section

of the Federal Register notice captioned "Applicable Statute and Regulations," Commerce noted:

"[U]nless otherwise indicated, all citations to Department of Commerce (Department) regulations

refer to the regulations codified at 19 CFR part 353 (1996)."  *Id*., 67 Fed. Reg. at 43,278.

On July 30, 2002, the effective date of the termination of the 1996 Suspension Agreement,

Commerce officially resumed the antidumping investigation that it had begun in January 1996.  *See*

Fresh Tomatoes From Mexico: Notice of Termination of Suspension Agreement, Termination of

Sunset Review, and Resumption of Antidumping Investigation, 67 Fed. Reg. 50,858 (Aug. 6, 2002)

("Notice of Resumption of AD Investigation").[7]  In accordance with the regulations, the investigation

was resumed as if Commerce had published its affirmative Preliminary Determination on that date.

*Id*., 67 Fed. Reg. at 50,860.  Thus, as Commerce's notice indicated, the deadline for issuance of the

agency's Final Determination in the resumed investigation was December 12, 2002.  *Id*., 67 Fed.

---

[7]The ITC followed Commerce's lead, terminating its sunset review and reopening its injury investigation as part of the resumed antidumping investigation.  *See* Fresh Tomatoes From Mexico: Resumption and Scheduling of the Final Phase of An Antidumping Investigation, 67 Fed. Reg. 56,854 (Sept. 5, 2002).

SVC sought judicial review of the determinations of Commerce and the ITC terminating (or, alternatively, declining to reopen) their sunset reviews.  However, that action was dismissed as untimely.  *See* San Vicente Camalu SPR de RI v. United States, 29 CIT ____, 366 F. Supp. 2d 1373 (2005).

Reg. at 50,860.

Even as the antidumping investigation was being resumed, however, there were signs that – at least in some quarters – hope for a suspension agreement had not faded.  For example, the Notice of Resumption of the Antidumping Investigation advised:  "On July 3, 2002, the California Tomato Commission filed letters of accession from twenty-four Baja California growers/exporters of fresh tomatoes, asserting that these growers/exporters represent new signatories and, when added to the existing Baja California signatories, represent 94.8 percent of exports of fresh tomatoes from Baja California to the United States."  *Id*., 67 Fed. Reg. at 50,859.  Ultimately, however, Commerce concluded that, without the participation of the signatories that had given notice of their withdrawal, the 1996 Suspension Agreement would no longer satisfy the statutory requirement that it cover "substantially all" imports of subject merchandise.  *Id*.

In a victory for SVC,[8] the Notice of Resumption of the Antidumping Investigation announced that – rather than soliciting updated information for use in the resumed investigation – Commerce had decided to rely on "the original information submitted by the original respondents for the original period of investigation."  *Id*., 67 Fed. Reg. at 50,858-59.  Commerce similarly confirmed that the Period of Investigation for the resumed antidumping investigation was March 1, 1995 through February 29, 1996.  *Id*.  Finally, like the late June 2002 notice of Commerce's intent to resume the investigation, the section of the Federal Register notice captioned "Applicable Statute

---

[8]In response to Commerce's request for comments as to whether it should obtain updated information to complete the antidumping investigation, SVC strongly urged the agency to rely on the existing administrative record.  *See* Commerce Memorandum re: Resumed Antidumping Investigation on Fresh Tomatoes from Mexico; Respondent Selection and Period of Investigation (July 30, 2002) (attached to Pl.'s Surreply Brief); Tr. at 32-33, 35, 37, 55-56, 79, 95-96.

and Regulations" noted:  "[U]nless otherwise indicated, all citations to Department of Commerce (Department) regulations refer to the regulations codified at 19 CFR part 353 (1996)."  *Id.*, 67 Fed. Reg. at 50,858.

As amended in 1997, Commerce's regulations would require that the Mexican growers/exporters submit a proposed suspension agreement to Commerce no later than 15 days after the July 30, 2002 deemed date of issuance of Commerce's Preliminary Determination (that is, by August 14, 2002); that Commerce and the Mexican growers/exporters initial a proposed suspension agreement and give notice to all interested parties no later than 30 days after the Preliminary Determination (by August 29, 2002); and that a suspension agreement be finalized and signed no later than 60 days after the Preliminary Determination (by September 29, 2002).  *See generally* 19 C.F.R. § 351.208 (1998).  But, as the resumed antidumping investigation gained momentum in the days and weeks following July 30, 2002, those dates flew by with no sign of a new suspension agreement.

According to SVC, "absent notice of a possible suspension on August 29 or notice of an actual suspension on September 29, [the company] proceeded to defend itself vigorously against antidumping charges at an enormous cost . . . in both time and money."  Pl.'s Brief at 5.  In particular, SVC emphasizes that it "dedicated significant resources, and incurred considerable costs to defend its questionnaire responses during three Commerce-ordered verifications."  Pl.'s Brief at 16 (footnote omitted); *see also id.* at 5-6 (footnotes with citations omitted).

On November 12, 2002, SVC learned for the first time that a new proposed suspension agreement had been initialed by Commerce and certain Mexican growers/exporters a few days

earlier, on November 8, 2002.  *See* Pl.'s Brief at 4 (footnote with citation omitted); Suspension of

Antidumping Investigation:  Fresh Tomatoes From Mexico, 67 Fed. Reg. 77,044, 77,045 (Dec. 16,

2002) ("Notice of 2002 Suspension Agreement") (noting date on which proposed agreement was

initialed); Commerce Memorandum to All Interested Parties (Nov. 12, 2002) (A.R. Pub. Doc. 30A),

and attached Agreement Proposal – 11/08/2002.   The first page of the proposed suspension

agreement stated that Commerce and the signatory producers/exporters were entering into the

suspension agreement pursuant to the 1996 regulations (specifically, 19 C.F.R. § 353.18 –

"Suspension of Investigation").  *Id.*

        According to SVC, Commerce should have taken action at the time the new proposed

suspension agreement was initialed "to reduce the burdens imposed on SVC by the ongoing

antidumping investigation."  *See* Pl.'s Brief at 16.  SVC emphasizes that – even after the proposed

suspension agreement was announced – the meter kept running, as its costs "continued to grow as

SVC had to file first a case brief, then a rebuttal brief at Commerce; and grow, as SVC had to file

first questionnaire responses, then a prehearing brief, at the U.S. International Trade Commission."

*Id.* at 16-17 (footnote omitted).

         The 2002 Suspension Agreement was finalized and signed on December 4, 2002 – eight

days before the deadline for issuance of Commerce's Final Determination in the resumed

antidumping investigation.  *See* Notice of 2002 Suspension Agreement, 67 Fed. Reg. at 77,045

(stating date that agreement was signed).  Commerce's notice of the suspension issued on December

10, 2002, and was received by SVC on December 11, 2002.  *Id.*, 67 Fed. Reg. at 77,046 (indicating

date of notice); Pl.'s Brief at 4 & n.10 (noting date of SVC's receipt of notice).  The notice was

published in the Federal Register – together with the text of the 2002 Suspension Agreement – on

December 16, 2002.  Both were stated to be effective as of that date.  *See* Notice of 2002 Suspension

Agreement, 67 Fed. Reg. at 77,044 (noting effective date of suspension), 77,048 (noting effective

date of 2002 Suspension Agreement).

Like Commerce's two prior notices in the resumed investigation, the Federal Register notice

announcing the 2002 Suspension Agreement noted that, "unless otherwise indicated, all citations to

Department of Commerce (Department) regulations refer to the regulations codified at 19 CFR part

353 (1996)."  *See* Notice of Intent to Terminate Suspension Agreement & Sunset Review, and to

Resume AD Investigation, 67 Fed. Reg. at 43,278; Notice of Resumption of AD Investigation, 67

Fed. Reg. at 50,858; Notice of 2002 Suspension Agreement, 67 Fed. Reg. at 77,045.

The Notice of the 2002 Suspension Agreement further explained that – as a result of the new

suspension agreement – Commerce was "adjusting the security required from signatories to zero."

*See id.*, 67 Fed. Reg. at 77,046.  However, for non-signatories like SVC, "[t]he security rates in effect

. . . remain as published in the Preliminary Determination."  *Id.*, 67 Fed. Reg. at 77,046, 77,048.

## II.  <u>Analysis</u>

As a threshold matter, the Government invokes justiciability and related principles, as well

as the doctrine of exhaustion of administrative remedies, and argues that this action must be

dismissed.  *See generally* Def.'s Brief at 5-6, 9-11; Def.'s Surreply Brief at 2-4, 5-14.  *But see* Pl.'s

Reply Brief at 11-14; Pl.'s Surreply Brief at 11-21.

The parties' dispute on the merits focuses on whether Commerce's December 2002

suspension of the resumed investigation was in accordance with law.  As noted above, the

Government maintains that – like other aspects of the resumed investigation – Commerce's decision to suspend that investigation was properly subject to the 1996 regulations, and the timetable for suspension agreements specified therein.  *See generally* Def.'s Brief at 6-7, 12-17; Def.'s Surreply Brief at 4-5, 14-26.  In contrast, SVC asserts that the suspension was unlawful.  According to SVC, any suspension of the resumed investigation should have been pursuant to the regulations as amended in 1997, which significantly advanced the deadlines for the negotiation of suspension agreements for the very purpose of sparing parties the kind of time and money that SVC expended in the course of the resumed investigation here.  *See generally* Pl.'s Brief at 1-2, 9, 15-21; Pl.'s Reply Brief at 2-11, 14-15; Pl.'s Surreply Brief at 2-11, 21-23.

The parties' respective arguments are detailed and analyzed below.

## A.   Justiciability and Related Threshold Issues

In its surreply brief, the Government raises for the first time various threshold challenges to SVC's prosecution of this action.  The Government argues that the case must be dismissed because it presents no "justiciable case or controversy"; because SVC lacks "a real interest" or "stake in the outcome of this litigation"; and because SVC's "challenge is now moot" since "the Court cannot grant any relief or provide any redress."  *See* Def.'s Surreply Brief at 5-7; *see also id.* at 2.  *But see* Pl.'s Surreply Brief at 11-16.  The Government further claims that "SVC has failed to establish a harm or injury for which the Court may grant relief."  *See* Def.'s Surreply Brief at 7-8; *see also id.* at 2-3.  *But see* Pl.'s Surreply Brief at 17.

Specifically, the Government emphasizes that "SVC argues that, had Commerce used the shorter deadlines [for negotiation and completion of a suspension agreement] prescribed by the 1997

regulations, SVC would have been provided the opportunity to cease participation in the resumed

investigation [by late September 2002, at the latest], saving it . . . time and resources."  Def.'s

Surreply Brief at 5.  The Government asserts that this action is therefore moot, because "[r]egardless

of . . . the final ruling upon the merits of this case, SVC has already undergone the 'alleged harm'

at issue by participating in the resumed investigation.   Ordering Commerce to terminate the

Suspension Agreement and issue a Final Determination will not remedy this 'alleged harm.'" Def.'s

Surreply Brief at 6.

The Government further contends that "the harm alleged by SVC is the alleged burden it

incurred by having to file case briefs and to respond to other parts of the resumed investigation."

Def.'s Surreply Brief at 8.  According to the Government, that burden "fail[s] to establish a harm or

injury for which the Court may grant relief," because "the additional business expenses of having

to participate in an agency proceeding is not harm, and thus cannot be remedied by the Court."  *Id*.

(*citing* National Hand Tool Corp. v. United States, 14 CIT 61, 66-68 (1990); Nissan Motor Corp.

v. United States, 10 CIT 820, 823-24, 651 F. Supp. 1450, 1454 (1986)).

The Government's arguments are cloaked in the language of justiciability and related

doctrines, but they are predicated on a mischaracterization or oversimplification of SVC's case and

the relief that SVC seeks.  True, SVC argues that "absent notice of a possible suspension [in August

and September 2002], [it] proceeded to defend itself vigorously against antidumping charges at an

enormous cost to itself in both time and money" through the autumn of that year.  *See* Pl.'s Surreply

Brief at 13.  However, contrary to the Government's implication, SVC is not trying to recoup its

sunk costs incurred in the course of the resumed antidumping investigation.  Nor are those sunk costs

the sole (much less the primary) injury of which SVC complains.

As section I above notes, the gravamen of SVC's case is that – some eleven years after Commerce began its antidumping investigation of fresh tomatoes from Mexico – the agency has yet to issue its Final Determination. *See*, *e.g.*, Tr. at 15-16; Pl.'s Brief at 1; Amended Complaint ¶¶ 24-28 & Prayer for Relief ¶ 4. And the remedy that SVC seeks is a ruling remanding this matter to Commerce with instructions to immediately rescind the 2002 Suspension Agreement and to issue its Final Determination in the underlying antidumping investigation "forthwith." *See*, *e.g.*, Pl.'s Brief at 9, 11, 17-21 & n.59; Pl.'s Reply Brief at 14-15; Pl.'s Surreply Brief at 14-17, 22-23; Tr. at 15-16; Amended Complaint at Prayer for Relief.

The rescission of the 2002 Suspension Agreement apparently would open the door for SVC to export its tomatoes to the United States; and Commerce's issuance of an affirmative Final Determination would, in turn, "require the completion of the [ITC's] final injury investigation." Pl.'s Surreply Brief at 16; *see also* Pl.'s Brief at 8 ("Commerce's actions cost SVC its right to a timely injury determination"); Tr. at 15-16 (issuance of Commerce's Final Determination is "very important" to SVC, because SVC seeks "a final determination by the [ITC] as to whether or not there is injury"; "there has never been . . . [a] final injury determination" in this case); Notice of Intent to Terminate Suspension Agreement & Sunset Review, and to Resume AD Investigation, 67 Fed. Reg. at 43,280 (noting that "If the Department makes a final affirmative determination, then the ITC is scheduled to make its final determination concerning injury within 45 days after publication of the Department's final determination"); Notice of Resumption of AD Investigation, 67 Fed. Reg. at 50,860 (same); Tr. at 25-26, 47-48, 83 (discussing Mexican government's prohibition on export of

tomatoes by non-signatories of the 2002 Suspension Agreement); Amended Complaint ¶¶ 12-13 (same).

Finally, if the ITC made an affirmative Final Injury Determination, an antidumping duty order would issue. *See* Notice of Intent to Terminate Suspension Agreement & Sunset Review, and to Resume AD Investigation, 67 Fed. Reg. at 43,280 (noting that, "[i]f both the Department's and the ITC's final determinations are affirmative, the Department will issue an antidumping duty order"); Notice of Resumption of AD Investigation, 67 Fed. Reg. at 50,860 (same).

In short, there is nothing that is the least bit "abstract" about this action. As SVC bluntly puts it, granting SVC the relief that it seeks here ultimately "may or may not result in an antidumping duty order"; but, at a minimum, in the near term, it would "certainly result in *something*." Pl.'s Surreply Brief at 16 (emphasis added). The Government's arguments as to justiciability and related doctrines are thus lacking in merit.

## B. Exhaustion of Administrative Remedies

In the alternative, the Government argues that this action should be dismissed because SVC did not object to Commerce's application of the 1996 regulations at the agency level, and thus failed to exhaust its administrative remedies. *See generally* Def.'s Brief at 5-6, 9-11; Def.'s Surreply Br. at 3-4, 8-14.

Requiring exhaustion even in a discretionary, non-jurisdictional context is generally sound policy, because it allows the agency to apply its expertise, to correct its own mistakes, and to compile an adequate record to support judicial review, advancing the dual purposes of protecting agency authority and promoting judicial efficiency. *See* Woodford v. Ngo, ____ U.S. ____, ____, 126 S.

Ct. 2378, 2384-86 (2006) (discussing two main purposes of doctrine of exhaustion); Richey v.

United States, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (exhaustion "serves 'the twin purposes . . . of

protecting administrative agency authority and promoting judicial efficiency'") (*quoting* Sandvik

Steel Co. v. United States, 164 F.3d 596, 600 (Fed. Cir. 1998)).  Accordingly, in actions reviewing

determinations in antidumping investigations, the Court of International Trade requires litigants to

exhaust administrative remedies "where appropriate."  28 U.S.C. § 2637(d) (2000).

As discussed in greater detail below, SVC contends that it could not have objected to

Commerce's application of the 1996 regulations at the agency level, because it had no timely notice

that the agency was applying those regulations.  Thus, according to SVC, the doctrine of exhaustion

has no relevance here.  *See* Pl.'s Reply Brief at 11-12; Pl.'s Surreply Brief at 17-20.  SVC further

argues that, even if is charged with notice of Commerce's application of the 1996 regulations, its

failure to exhaust its administrative remedies is excusable under two exceptions.  *See* Pl.'s Reply

Brief at 12-14; Pl.'s Surreply Brief at 20-21.

### i.  Notice

Pointing to Commerce's June 2002 and August 2002 Federal Register notices, as well as to

Commerce's November 12, 2002 Memorandum (and the attached proposed suspension agreement),

the Government argues that "SVC was not only placed on notice of Commerce's use of the [1996]

regulations . . . , it also was afforded a full opportunity to comment" on their applicability.  Thus,

according to the Government, although "SVC was provided multiple opportunities to raise its

concerns regarding the use of the [1996] regulations" at the agency level, SVC failed to do so.  Def.'s

Brief at 5-6, 10-11; Def.'s Surreply Brief at 3, 9-11; Tr. at 31 (arguing that SVC was put on notice

by Federal Register notices in June 2002 and August 2002), 43 (discussing "these two notices in

August and June" 2002), 49 (asserting that SVC was given notice of use of 1996 regulations in

"June, July and August" 2002); *see* Notice of Intent to Terminate Suspension Agreement & Sunset

Review, and to Resume AD Investigation, 67 Fed. Reg. at 43,278; Notice of Resumption of AD

Investigation, 67 Fed. Reg. at 50,858; Commerce Memorandum to All Interested Parties (Nov. 12,

2002) and attached Agreement Proposal – 11/08/2002 (A.R. Pub. Doc. 30A).

        In particular, the Government emphasizes that both the June 2002 and the August 2002

Federal Register notices expressly stated, under the unambiguous caption "Applicable Statute and

Regulations": "[U]nless otherwise indicated all citations to Department of Commerce (Department)

regulations refer to the regulations codified at 19 CFR *part 353* (*1996*)."  Tr. at 31; Def.'s Brief at

10-11; Def.'s Surreply Brief at 9-11; *see* Notice of Intent to Terminate Suspension Agreement &

Sunset Review, and to Resume AD Investigation, 67 Fed. Reg. at 43, 278; Notice of Resumption of

AD Investigation, 67 Fed. Reg. at 50,858 (emphases added).[9]

        SVC maintains that the language of the Federal Register notices was insufficient to constitute

notice.  *See* Pl.'s Reply Brief at 11-12; Pl.'s Surreply Brief at 17-19; Tr. at 16-17, 19-20, 23-24, 28-

30, 96-97.  SVC argues, in essence, that – absent a specific and unequivocal statement that any

potential future suspension agreements would be governed by the 1996 regulations – the Government

_____

        [9]In addition, the final sentences of both the June 2002 and the August 2002 Federal Register
notices stated that Commerce's determinations were being "issued and published in accordance with
. . . 19 CFR 353.15 (1996)" – a provision of the 1996 regulations.  *See* Notice of Intent to Terminate
Suspension Agreement & Sunset Review, and to Resume AD Investigation, 67 Fed. Reg. at 43,280;
Notice of Resumption of AD Investigation, 67 Fed. Reg. at 50,860 (citing same provision of 1996
regulations, and using virtually identical language).

cannot claim that notice was sufficient.

To be sure, the language of the Federal Register notices (quoted above) *can* be read to refer only to the citations in the notices themselves. It is not a direct statement that the agency proceedings that are the subject of the notice are governed by a particular version of the regulations.[10] But the language employed in the June 2002 and August 2002 Federal Register notices is Commerce's standard verbiage, the significance of which is presumably well known to all in the international trade community. In any event, SVC's principal arguments concerning the sufficiency of notice do not turn on nuances of linguistics.[11]

_____

[10]SVC contrasts the language of Commerce's August 2002 Notice of the Resumption of the Antidumping Investigation with a sentence in Commerce's notice of the initiation of its sunset review of the suspended investigation, which stated that "[t]he Department's procedures for the conduct of sunset reviews are set forth in [the regulations as amended in 1997]." *See* Pl.'s Surreply Brief at 18 (*quoting* Notice of Initiation of Five-Year Review, 66 Fed. Reg. at 49,926); Tr. at 20-22.

However, SVC is comparing apples and oranges. The comparable provision of Commerce's Notice of Initiation of Five-Year Review actually parallels the language of Commerce's August 2002 notice: "[U]nless otherwise indicated, all citations to the Department of Commerce's ("Department") regulations are to 19 CFR part 351 (2001)." *See* Notice of Initiation of Five-Year Review, 66 Fed. Reg. at 49,926. Moreover, even if SVC were to prove that Commerce could have drafted the notice more clearly, that would not *ipso facto* render the language of the Commerce's August 2002 notice insufficient.

[11]Although SVC adamantly maintains that the language of the Federal Register notices *did not* constitute notice that negotiation of any potential future suspension agreement would be governed by the 1996 regulations, SVC has never really staked out a position as to what that language *does* mean.

When pressed on the matter at oral argument, SVC at one point allowed that the language at issue might mean that the resumed investigation – although not the negotiation of the suspension agreement – was subject to the 1996 regulations. Tr. at 17. But SVC then quickly backpedaled. Tr. at 20, 23. In the end, SVC simply declined to take a position as to whether the language specified the version of the regulations applicable to the resumed investigation. Tr. at 28-29.

SVC first argues that the language of the Federal Register notices was not sufficient because Commerce there did not "expressly stipulate that . . . a possible re-suspension would be governed by [the 1996] regulations." *See* Pl.'s Surreply Br. at 18-19.[12]   However, SVC cites no authority to support its claim that such specificity was required; nor can it do so.   It would be – frankly – impracticable and unreasonable to require that an agency foresee and expressly recite in its Federal Register notices each and every conceivable future development or event in a proceeding, and then separately state the version of the agency's regulations applicable to each such individual potential future development or event.   To the contrary, an agency is entitled to give general notice of the applicable version of the regulations (as Commerce did here).   Thereafter, the parties are entitled to rely on that general statement by the agency; and, if a party has a specific question in light of the agency's general notice, the party must timely raise that question with the agency.   Indeed, a party ignores such "boilerplate" at its peril.

Equally unavailing is SVC's argument that the Federal Register notices "address[] topics that are definitely *not* subject to [the 1996 regulations]" – specifically, the termination of the sunset

---

At other points in oral argument, SVC surmised that the language referred only to the citations to regulations in the Federal Register notices themselves (though SVC never explained why a notice would cite to a version of the regulations other than the version applicable to the proceeding which was the subject of the notice). *See* Tr. at 19-20, 23-24.   In any event, as noted above, the language in the Federal Register notices is Commerce's standard verbiage.   It seems rather unlikely that SVC and its counsel – as experienced and sophisticated members of the international trade community – would attach so little significance to the language at issue, just as it seems unlikely that they would think it reasonable for Commerce to be silent as to the statutes and regulations applicable to the proceedings that were the subject of the notice.

[12]*See also* Tr. at 17 ("There's nothing in this [August 2002] notice that talks about a new suspension agreement – a request for a suspension agreement.").

review.  *See* Pl.'s Surreply Brief at 18-19; Tr. at 20.  That argument implicitly assumes that SVC

took actual notice of Commerce's general reference to the 1996 regulations in the Federal Register

notices at the time, but then observed that the Federal Register notices addressed the sunset review

(which was not governed by the 1996 regulations), and therefore discounted Commerce's general

reference.  However, there is no indication in the record that, in fact, SVC took actual notice of the

general reference to the 1996 regulations when it read either of the Federal Register notices – much

less that SVC was misled by reading the general reference in tandem with the Federal Register

notice's discussion of the termination of the sunset review.  In any event, as discussed immediately

above, if SVC actually did parse the Federal Register notices at the time and found them confusing,

SVC was obligated to seek clarification from the agency in a timely fashion.

      SVC's argument that "the [August 2002 Federal Register] notice's reference to, and

discussion of, the resumed investigation contained no citation to agency regulations" similarly misses

the mark.  *See* Pl.'s Surreply Br. at 18-19.  Commerce's general reference to the 1996 regulations

would have been no less effective if the *entire* Federal Register notice had been devoid of specific

citations to agency regulations.  And, once again (and in any event), any party confused by such a

notice is required to raise the issue with the agency promptly.

      In addition to the June 2002 and August 2002 Federal Register notices, the Government notes

that the proposed suspension agreement attached to Commerce's November 12, 2002 Memorandum

to All Interested Parties "also referred to, and cited to, the [1996] regulation[s] and articulated that

the relevant deadlines codified in [the 1996 regulations] would be used."  *See* Def.'s Surreply Brief

at 11; Commerce Memorandum to All Interested Parties (Nov. 12, 2002) (A.R. Pub. Doc. 30A), and

attached Agreement Proposal – 11/08/2002.  The Government thus cites the November 12, 2002

Memorandum as a third occasion on which SVC was put on notice of Commerce's reliance on the

1996 regulations, and yet failed to raise any concerns with the agency.  *See* Tr. at 44-45, 50, 57.

SVC dismisses the notion that Commerce's November 12, 2002 Memorandum constituted

notice, asserting that the proposed suspension agreement attached to the memorandum "did not

address the procedures involved in the possible suspension of the investigation, but rather the

procedures that the agency and certain respondents had agreed to follow *if* agreement on suspension

was eventually reached."  Pl.'s Surreply Brief at 19-20; Tr. at 97.  SVC further argues that "the

November 12th document issued well after the applicable law had been violated by the agency."  Pl.'s

Surreply Brief at 19.

However, contrary to SVC's claim, the first page of the proposed suspension agreement

expressly stated that Commerce and the signatory producers/exporters were entering into the

suspension agreement pursuant to the 1996 regulations (specifically, 19 C.F.R. § 353.18 –

"Suspension of Investigation").[13]  *See* Agreement Proposal – 11/08/2002 (attached to Commerce

Memorandum to All Interested Parties (Nov. 12, 2002) (A.R. Pub. Doc. 30A)).[14]

---

[13]Subsection (g), in particular, is captioned "Procedure for Suspension of Investigation," and
specifies the deadlines for exporters' submission of a proposed suspension agreement to Commerce,
and for Commerce's notification to interested parties concerning a proposed agreement that has been
initialed. *See* 19 C.F.R. § 353.18(g) (1996).  Similarly, subsection (a) provides that Commerce "may
suspend an investigation at any time before [Commerce's] final determination."  *See*  19 C.F.R. §
353.18(a) (1996).

[14]The 1996 regulations are also cited elsewhere in the proposed suspension agreement.  *See*
Agreement Proposal – 11/08/2002 (attached to Commerce Memorandum to All Interested Parties
(Nov. 12, 2002) Agreement Proposal – 11/08/2002 (A.R. Pub. Doc. 30A)) at IV.D ("Rejection of
Submissions," *citing* 19 C.F.R. §§ 353.31 & 353.32), App. C (*citing* 19 C.F.R. §§ 353.31 & 353.32),

Even more to the point, without regard to the specific language of the proposed suspension agreement,[15] the very fact that SVC was served with a copy of a proposed suspension agreement on or about November 12, 2002 sufficed to put SVC on notice that Commerce was not applying the regulations as amended in 1997.  *See* Tr. at 97 (counsel for SVC concedes that, certainly as of November 12, 2002, SVC would have known that "[s]omething was up," since – absent extension – proposed suspension agreement was patently untimely under regulations as amended in 1997). SVC nevertheless filed no comments on the proposed suspension agreement; nor did it otherwise take exception to Commerce's reliance on the 1996 regulations.  *See* Tr. at 44-45, 50, 57, 60-61, 67; Commerce Memorandum to File re: Comments on the Proposed Agreement Suspending the Antidumping Duty Investigation – Fresh Tomatoes from Mexico (Dec. 12, 2002) (A.R. Pub. Doc. 32) (identifying parties that filed comments on proposed suspension agreement).

As discussed above, the Government makes a compelling case that, as early as June 2002, SVC was on constructive (if not actual) notice that Commerce was applying the 1996 regulations to the resumed investigation.  But, in any event, SVC was on notice by November 12, 2002 at the very latest that Commerce was not applying the regulations as amended in 1997 to the agency's then-ongoing negotiation of a proposed suspension agreement.  And, contrary to SVC's claims, raising

---

App. H (*citing* 19 C.F.R. §§ 353.31 & 353.32).  As SVC indicates, however, those references "deal with the procedures that the agency and [the Mexican growers/exporters] . . . agreed to follow" in the implementation of the suspension agreement "*if* agreement on suspension was eventually reached."  *See* Pl.'s Surreply Brief at 19-20.

[15]In other words, even if the proposed suspension agreement had made no reference to Commerce's 1996 regulations, the timing of the proposal itself sufficed to put SVC on notice that Commerce was not applying the regulations as amended in 1997.

its concerns with Commerce even at that late date would not necessarily have been an empty gesture or a pointless formality. *See* section II.B.ii, *infra* (discussing futility exception to doctrine of exhaustion).

## ii.  Exceptions to the Doctrine of Exhaustion

SVC argues that, even if it had actual or constructive notice that Commerce was applying the 1996 regulations, any failure to exhaust its administrative remedies nevertheless should be excused under two established exceptions to the doctrine of exhaustion – the "futility" exception, and the exception for "pure questions of law." *See generally* Pl.'s Reply Brief at 12-14; Pl.'s Surreply Brief at 20-21.

The Court of Appeals has recognized that "[a] party need not exhaust [its] administrative remedies where invoking such remedies would be futile." Asociacion Colombiana de Exportadores de Flores v. United States, 916 F.2d 1571, 1575 (Fed. Cir. 1990) (citation omitted); *see also* McCarthy v. Madigan, 503 U.S. 140, 148 (1992) (recognizing futility exception to doctrine of exhaustion, where agency was powerless to grant relief sought) (citation omitted).  Emphasizing that it first learned of the proposed suspension agreement on November 12, 2002, SVC asserts that "[i]t would have been futile . . . at that late date to argue with Commerce that notification of the proposed agreement should have been forthcoming on August 29, 2002." Pl.'s Reply Brief at 12-14; *see also* Pl.'s Surreply Brief at 20-21.[16]  *But see* Def.'s Surreply Brief at 3-4, 11, 13-14.

---

[16]SVC thus apparently assumes that it could not be required to object to application of the 1996 regulations until it was on notice that a proposed suspension agreement was under consideration.  As discussed above, however, there is a strong argument that SVC need only have been on notice that the 1996 regulations were being applied in the resumed investigation – and that SVC should have been on notice of that fact as early as June 2002. *See* section II.B.i, *supra*.

However, as SVC observes elsewhere, the regulations as amended in 1997 expressly authorize Commerce to extend the regulatory deadlines for good cause.  *See* Pl.'s Brief at 5 (*citing* 19 C.F.R. § 351.302(b) (1998), and emphasizing that "Commerce had the authority to extend the relevant regulatory deadlines but failed to do so"); Pl.'s Reply Brief at 10 n.10 (same); 19 C.F.R. § 351.302(b) (1998) ("Extension of time limits.  Unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established by this part.").[17]  And SVC gives no reason why Commerce could not have extended the relevant regulatory deadlines retroactively (or *nunc pro tunc*), if SVC had registered its objection with Commerce promptly in mid-November 2002 and if Commerce had been persuaded that the 1997 regulations should apply.  *See* Tr. at 35, 52-54, 72-73, 97-99 (Government counsel noting that Commerce could have exercised option of extending deadlines); Birt v. Surface Transportation Board, 90 F.3d 580, 589 (D.C. Cir. 1996) (Wald, J.) (sustaining retroactive extension by agency); *cf.* Sierra Club v. Environmental Protection Agency, 356 F.3d 296, 309-10 (D.C. Cir. 2004) (Garland, J.).  It is thus far from clear that it would have been futile for SVC to make its concerns known to Commerce even as late as mid-November 2002, after SVC received notice of the proposed suspension agreement.

SVC stands on firmer ground in seeking to excuse its failure to exhaust its administrative remedies by invoking the exception for "pure questions of law."  *See generally* Pl.'s Reply Brief at 12-14; Pl.'s Surreply Brief at 20-21.  *But see* Def.'s Surreply Brief at 3-4, 11-13.  As the Supreme

---

[17]*See also* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,312 (noting that intent of 19 C.F.R. § 351.302(b) (1998) is for "the Department [to] give itself authority to extend the [regulatory] deadlines where necessary"); Tr. at 53 (Government discussing language of preamble to 19 C.F.R. § 351.302(b) (1998), in Final Rule, 62 Fed. Reg. at 27,312).

Court explained in <u>McKart v. United States</u>, exhaustion generally is not required where the issue

before the court is a pure question of law, since resolution of such an issue "does not require any

particular expertise on the part of the [agency]," and "judicial review would not be significantly

aided by an additional administrative decision." <u>McKart v. United States</u>, 395 U.S. 185, 198-99

(1969); *see also* <u>Consol. Bearings Co. v. United States</u>, 348 F.3d 997, 1003 (Fed. Cir. 2003)

(recognizing, but finding inapplicable, "pure question of law" exception to doctrine of exhaustion).

SVC correctly notes that "the issue of whether Commerce should have followed the

procedures set forth in [the regulations as amended in 1997] with respect to the suspension of the

antidumping investigation involves strictly questions of law." *See* Pl.'s Reply Brief at 13; *see also*

Pl.'s Surreply Brief at 20.  Accordingly, SVC's failure to raise that issue at the agency level does not

preclude SVC from litigating it here.

## C.  <u>The Applicable Regulations</u>

At the heart of the parties' dispute over the applicability of the 1996 regulations *versus* the

regulations as amended in 1997 is 19 C.F.R. § 351.701, which is captioned "Applicability Dates."

*See* 19 C.F.R. § 351.701 (1998).  That regulation sets forth, in three sentences, the effective dates

for the new part 351 of Commerce's regulations,[18] which includes the 1997 regulations on the timing

of suspension agreements that SVC claims Commerce violated in this case.

The first two sentences of § 351.701 specify:

---

[18]Structurally, the 1997 amendments to the regulations "consolidate[d] the [antidumping] and [countervailing duty] regulations into a new part 351, and . . . remove[d] parts 353 and 355." *See* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,296.

> The regulations [as amended in 1997] . . . apply . . . to all investigations and other *segments of proceedings* initiated on the basis of petitions filed or requests made after June 18, 1997 and to segments of proceedings self-initiated by [Commerce] after June 18, 1997. *Segments of proceedings* to which part 351 do[es] not apply will continue to be governed by the regulations in effect on the date the petitions were filed or requests were made for those segments, to the extent that those regulations were not invalidated by the URAA [Uruguay Round Agreements Act] or replaced by the interim final regulations published on May 11, 1995 (60 FR 25130 (1995)).

19 C.F.R. § 351.701 (1998) (emphasis added). The regulations define a "[s]egment of a proceeding" as "a portion of the proceeding that is reviewable under [19 U.S.C. § 1516a]." *See* 19 C.F.R. § 351.102 (1998). And it is undisputed that "[a] determination . . . to suspend an antidumping duty . . . investigation" is reviewable under 19 U.S.C. § 1516a. *See* 19 U.S.C. § 1516a(a)(2)(B)(iv) (2000).

SVC's principal argument is that the events surrounding the 2002 Suspension Agreement constituted a separate "segment" of the antidumping proceeding, and – pursuant to 19 C.F.R. § 351.701 – should have been governed by the deadlines in the regulations as amended in 1997. *See generally* Pl.'s Reply Brief at 3-5; Pl.'s Surreply Brief at 2-6; Pl.'s Brief at 2-5, 9. Focusing on the phrase "segments of proceedings initiated on the basis of petitions filed or requests made after June 18, 1997," SVC has proffered two slightly different interpretations of § 351.701.

Initially, SVC asserted that, when the antidumping investigation resumed on July 30, 2002, "Commerce . . . began a separate and distinct 'segment of proceeding' . . . [which] ended on December 16, 2002, with a notice re-suspending the investigation." *See* Pl.'s Reply Brief at 4 (citations omitted). SVC argued that "[i]t is events during this distinct 'segment of proceeding,' which extends from July 30-December 16, 2002, that are the subject of this litigation." *Id*. (footnote omitted). SVC concluded that "since the 'segment of proceeding' at issue began after June 18, 1997,

the plain language of rule 351.701 stipulates that the 1997 regulations applied to Commerce's actions

during the 2002 segment." *Id*. at 4-5.

But SVC's fundamental premise was mistaken.  As the Government notes, July 30, 2002 did

not mark the beginning of a new "segment" of a proceeding.  It was simply the *resumption* of the

"investigation" that had begun in 1996.  That investigation was, by definition, based on a petition

filed *before* June 18, 1997 – an investigation that had not been completed (and thus had not become

reviewable), because it had been "suspended" by the 1996 Suspension Agreement for a number of

years, until that agreement was terminated effective July 30, 2002.  *See* Def.'s Brief at 13-14; Def.'s

Surreply Brief at 4-5, 17-19; Tr. at 31-32, 73.[19]

SVC switched tacks its final brief, and in oral argument.  SVC still contends that "the 2002

suspension constitutes a distinct segment of the proceeding."  Pl.'s Surreply Brief at 2; *see also* Tr.

at 5, 17, 85-87, 90-91.  However, SVC now asserts that the new "segment" began *not* on July 30,

2002, but – rather – on the date on which the Mexican growers/exporters submitted a proposed

suspension agreement to Commerce.[20]  *See* Pl.'s Surreply Brief at 3-4; *see also* Tr. at 5-6, 17, 85-87,

---

[19]The Government correctly observes that, when a suspension agreement that was signed at the preliminary determination stage is terminated, the statute requires Commerce to resume the underlying antidumping investigation that was underway prior to the suspension.  *See* 19 U.S.C. § 1673c(i)(1)(B) (2000); Def.'s Surreply Brief at 18.  The Government further notes that "[t]he regulations dictate that Commerce does not issue a new preliminary determination [upon resuming the investigation], but continues the investigation based upon the findings in the original preliminary determination."  *Id*. (citation omitted).

[20]SVC logically reasons that the Mexican growers/exporters "had to have filed their request to suspend between July 30, 2002 [the effective date of the termination of the 1996 Suspension Agreement, and the date on which the antidumping investigation resumed] and November 8, 2002 (the date Commerce initialed a proposed agreement)."  *See* Pl.'s Surreply Brief at 3-4; Tr. at 5-6.

90-91.

Although its second theory has some superficial appeal, the folly of SVC's interpretation of

19 C.F.R. § 351.701 is illustrated by the anomalous results that it would yield.  SVC emphasizes that

the regulations define a "[s]egment of a proceeding" as "a portion of the proceeding that is

reviewable under [19 U.S.C. § 1516a]," and that "[a] determination . . . to suspend an antidumping

duty . . . investigation" is reviewable under 19 U.S.C. § 1516a.  *See* 19 C.F.R. § 351.102 (1998); 19

U.S.C. § 1516a(a)(2)(B)(iv) (2000).  What SVC fails to consider is that Commerce's refusal to enter

into a suspension agreement is *not* reviewable under 19 U.S.C. § 1516a.  *See* 19 U.S.C. §

1516a(a)(2)(B)(iv) (2000) (only a determination to suspend an antidumping duty investigation is

reviewable; a *rejection* of a proposed suspension agreement is not listed as a reviewable

determination).[21]

Under SVC's interpretation of § 351.701, if negotiations between foreign producers/exporters

and Commerce were successful and led to a suspension agreement, then the negotiations would

constitute a separate "segment" and would be governed by the suspension agreement regulations in

place at the time of the negotiations (including the 1997 amendments).  But SVC's interpretation

would also mean that, if negotiations between foreign producers/exporters and Commerce failed (*i.e.*,

if the negotiations did not lead to the signing of a suspension agreement), then those negotiations

---

[21]*Compare* Tr. at 6 (SVC argues that "the Commerce Department can decide whether or not
to suspend [the investigation] and that suspension agreement, *whether or not it goes into place*, is
. . . reviewable by this Court under [19 U.S.C. § 1516a]") (emphasis added).

would *not* constitute a separate "segment."[22]  And the failed negotiations would be governed *not* by

the regulations in place at the time of the negotiations (including the 1997 amendments), but – rather

– by the regulations in force when the investigation at issue was commenced.

In short, under SVC's interpretation of 19 C.F.R. § 351.701, it would only be possible after

the fact (*i.e.*, *after* negotiations were complete and *after* a suspension agreement had been either

accepted or rejected by Commerce) to know whether or not those negotiations constituted a separate

"segment" of the proceeding and, thus, which version of the regulations applied to the negotiations.

Such an absurd result cannot have been intended.  *See*, *e.g.*, American Tobacco Co. v. Patterson, 456

U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid . . . unreasonable results whenever

possible."); Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (rules of statutory

construction and interpretation apply with equal force to administrative regulations) (citation

omitted); *see also* Tr. at 33-35 (Government argues absurdity of SVC's interpretation as applied to

1996 Suspension Agreement).

Contrary to SVC's claims, the negotiations leading up to the suspension of the investigation

in December 2002 actually were part of (*i.e.*, were subsumed in) the resumed antidumping

investigation, as the Government explains.  As discussed above, the antidumping investigation was

initiated on the basis of a petition filed in 1996 (*i.e.*, *before* June 18, 1997).  Thus, the negotiations

leading to the suspension of the investigation – as part of the *resumed* investigation – were governed

---

[22]*See* Tr. at 102 (Government explains that *negotiations* concerning a *potential* suspension
agreement are not separate "segment," because "if Commerce does not enter into the suspension
agreement the investigation would continue"), 104 (Government explains that "when you *sign* a
suspension agreement . . . [y]ou shift from an investigation segment to a suspension agreement
segment") (emphasis added).

by the 1996 regulations.  *See* Def.'s Surreply Brief at 16-19; Tr. at 31-32, 73, 104; *see also* Def.'s

Brief at 12-15.  The Government reasons:

> Although the negotiation of the new suspension agreement occurred in 2002, the regulations indicate that these events [surrounding the suspension of the investigation] are clearly tied to the resumed investigation.  The regulations [concerning the suspension of an investigation] in both part 353 [the 1996 regulations] and part 351 [the regulations as amended in 1997] indicate that all deadlines for the negotiation of a suspension agreement are tied to either the preliminary or final determination of an investigation. . . . Thus, the regulatory scheme clearly envisions that the events leading up to the signing of a suspension agreement occur within the confines of the investigation.

Def.'s Surreply Brief at 19.  The Government concludes that "[t]he resumed investigation, which

subsumed the suspension agreement negotiations, *ended* when the new suspension agreement was

*published*[23] and that suspension agreement became the new segment reviewable under [19 U.S.C.

§ 1516a]."  *Id.* (emphases added) (citation omitted); Tr. at 104 (Government explains that "when you

sign a suspension agreement . . . [y]ou shift from an investigation segment to a suspension agreement

segment").

---

[23]Although the Government here uses the term "ended," it was not a studied choice of words. The Government does not believe that the underlying antidumping investigation, which began in April 1996, "ended" in December 2002.  The investigation was simply suspended yet again, just as it had been previously suspended in 1996.

Similarly, notwithstanding the Government's statement, it is not entirely clear what event actually had the effect of suspending the resumed antidumping investigation – the finalization and signing of the 2002 Suspension Agreement on December 4, 2002; the issuance of Commerce's notice of the suspension and its notification to interested parties on or about December 10, 2002; or the December 16, 2002 Federal Register publication of both the notice of Commerce's determination to suspend the investigation and the text of the 2002 Suspension Agreement itself (both of which reflect an "effective" date of December 16, 2002).  *See* section I, *supra*.  It is clear that the resumed investigation was suspended sometime in December 2002; for present purposes, the precise date is immaterial.

In the alternative, SVC argues that – even if the negotiations culminating in the 2002 Suspension Agreement did not constitute a separate "segment" of the proceeding – the third sentence of 19 C.F.R. § 351.701 established an administrative practice which "dictate[d] that Commerce nonetheless should have followed the 1997 regulations during the events that led to the 2002 suspension."  Pl.'s Surreply Brief at 6; *see generally* 19 C.F.R. § 351.701 (1998); Pl.'s Reply Brief at 5-6; Pl.'s Surreply Brief at 6-7.

The third (and final) sentence of § 351.701 states:

> For segments of proceedings initiated on the basis of petitions filed . . . after January 1, 1995, but before [the 1997 amendments to the regulations] appl[y], [the regulations as amended in 1997] will serve as a restatement of [Commerce's] interpretation of the requirements of the [Trade Act of 1930] as amended by the URAA.

19 C.F.R. § 351.701 (1998).  SVC apparently reads that sentence as mandating, in essence, that – in all cases commenced after January 1, 1995 – the regulations as amended in 1997 must be applied.  But if Commerce had intended that sentence of the regulation to state what SVC asserts it does, Commerce could (and, presumably, would) have stated it much more simply.

Just as SVC misinterprets the first two sentences of 19 C.F.R. § 351.701, it misinterprets the last sentence as well.  As the Government explains, the last sentence of  § 351.701  is addressed to those situations where the applicable regulation would otherwise be a regulation that pre-dates the 1997 amendments (*i.e.*, a "pre-URAA regulation"), except that the pre-URAA regulation in question was – in effect – invalidated by the URAA.  To avoid Commerce's application of a pre-URAA regulation that is affirmatively inconsistent with the URAA, the third sentence of § 351.701 provides that – in such situations – Commerce will treat the regulations as amended in 1997 "as a restatement

of [Commerce's] interpretation of the requirements of the [Trade Act of 1930] *as amended by the URAA.*" *See* 19 C.F.R. § 351.701 (1998) (emphasis added); Tr. at 75-77, 101.[24]

As the Government correctly points out, the URAA was silent on the subject addressed by the pre-URAA regulation at issue here, 19 C.F.R. § 353.18 (1996) – that is, the deadlines for negotiating and signing a suspension agreement. The pre-URAA regulation thus is not inconsistent with the URAA in any way. Nor were the 1997 amendments reflected in 19 C.F.R. § 351.208 adopted by Commerce to implement the URAA. *See* 19 C.F.R. § 351.208 (1998). The new, more stringent deadlines for suspension agreements established in § 351.208 therefore cannot be said to be "a restatement of [Commerce's] interpretation of the requirements of the [statute] *as amended by the URAA.*"[25] *See* 19 C.F.R. § 351.701 (1998) (emphasis added); Def.'s Surreply Brief at 20-23; Tr.

_____

[24]As the Government explained at oral argument, the last sentence of 19 C.F.R. § 351.701 "only deals with situations where the URAA invalidated a prior reg[ulation] which isn't the case here . . . . That last sentence has to be taken in [the] context of the preamble . . . [which] explains the purpose of that last sentence. It states that the language was added because segments 'initiated on the basis of petitions filed or requests made after January 1, 1995' are subject to the URAA because the URAA is enacted. In other words, the URAA was already in effect and the Department of Commerce could not follow a regulation that was inconsistent with the statute[.] [A]nd in only those situations should Commerce apply [the regulation as amended in 1997] that is consistent with the statute, the URAA." Tr. at 75-76; *see also* Tr. at 101.

Unlike SVC's interpretation of the last sentence of § 351.701, the Government's interpretation of that sentence is easily read *in pari materia* with the sentence that precedes it. Specifically, the second sentence of the regulation expressly acknowledges that, in some situations, "the [otherwise applicable] regulations in effect on the date the petitions were filed" were "invalidated by the URAA." *See* 19 C.F.R. § 351.701 (1998). As the Government explains it, the third sentence provides that – in such situations, and *only* in such situations – the post-URAA regulations (*i.e.*, the regulations as amended in 1997) serve as URAA-compliant authority, even though they would otherwise be inapplicable. *See id.*; Tr. at 75-77, 101.

[25]Only some of the 1997 amendments to Commerce's regulations were designed to conform the antidumping and countervailing duty regulations to be consistent with the URAA. Other

at 76 (Government explains that "because the Uruguay Round did not speak to this procedural deadline [*i.e.*, the specific details of the timing of the negotiation and completion of a suspension agreement], the [relevant provisions of the 1996 regulations were] not in conflict with the URAA"; thus, Commerce properly applied the 1996 regulations in this case), 101 ("If there's something in the [URAA] which nullifies the [pre-URAA] regulation, we have to comply with what the law [*i.e.*, the URAA] is[,] but the URAA does not speak to this procedural deadline with regard to suspension agreements.").[26]

The Supreme Court has admonished:

> We must give substantial deference to an agency's interpretations of its own regulations. . . . Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"

---

amendments were designed to, *inter alia*, "simplify and streamline [Commerce's] administration of antidumping and countervailing duty proceedings." *See* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,296.

[26]SVC tries to make much of certain language in the regulatory history of 19 C.F.R. § 351.701 (1998). *See generally* Pl.'s Reply Brief at 6; Pl.'s Surreply Brief at 6-7. In particular, SVC relies heavily on a sentence which states that "the new regulations [*i.e.*, the regulations as amended in 1997] describe the administrative practice that [Commerce] will follow, unless there is a reason consistent with the amended Act to depart from that practice." Pl.'s Brief at 6; Pl.'s Surreply Brief at 7 (*quoting* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,378). It is difficult to reconcile the sentence that SVC cites with the actual text of § 351.701. But, whatever that sentence means, it is only regulatory history and cannot trump the plain language of the regulation itself.

In addition, giving the third sentence of § 351.701 the broad meaning and significance that SVC attaches to it would be at odds with the language in the preamble of that regulation, which explains that the third sentence is intended to "explain[] *the limited role* of [the regulations as amended in 1997] in proceedings to which they do not apply." *See* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,378 (emphasis added).

<u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (citations omitted).  Commerce, in particular, is entitled to "substantial deference . . . when interpreting and applying its own regulations."  <u>Torrington Co. v. United States</u>, 156 F.3d 1361, 1363 (Fed. Cir. 1998).[27]

As discussed above, Commerce's interpretation of 19 C.F.R. § 351.701 is in no way either "plainly erroneous or inconsistent with the regulation" itself.  Indeed, it is SVC's interpretation that would be unworkable and would lead to absurd results.  SVC's claim that the events surrounding the 2002 Suspension Agreement were subject to the more stringent deadlines established in Commerce's regulations as amended in 1997 must therefore be rejected.

---

[27]*See also* <u>Asociacion Colombiana de Exportadores de Flores v. United States</u>, 903 F.2d 1555, 1559-60 (Fed. Cir.1990) (attaching "substantial weight" to Commerce's interpretation of its own regulation, and explaining that "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order") (citations and internal quotation marks omitted); <u>Carolina Tobacco v. Bureau of Customs and Border Protection</u>, 402 F.3d 1345, 1349 (Fed. Cir. 2005) (noting that "'it is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts'") (*quoting* <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1363 (Fed. Cir. 2005) (citation omitted)).

This fundamental legal principle applies with particular force in a case such as this, which involves Commerce's administration of the antidumping regime.  The Court of Appeals has emphasized:

> Commerce is the acknowledged 'master' of the antidumping laws, and its interpretations of the pertinent statutes are 'worthy of considerable deference.' <u>Zenith Elecs. Corp. v. United States</u>, 77 F.3d 426, 430 (Fed. Cir. 1996); *see also* <u>Micron Tech., Inc. v. United States</u>, 117 F.3d 1386, 1394 (Fed. Cir. 1997) ('In antidumping cases, we acknowledge Commerce's special expertise and accord substantial deference to its construction of pertinent statutes.').

<u>Micron Tech., Inc. v. United States</u>, 243 F.3d 1301, 1312 (Fed. Cir. 2001).

### III.  <u>Conclusion</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record must be denied, and the Commerce Department's 2002 determination suspending the resumed antidumping investigation of fresh tomatoes from Mexico is sustained.  *See* Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico, 67 Fed. Reg. 77,044 (Dec. 16, 2002).

Judgment will enter accordingly.

/s/
_____
                    Delissa A. Ridgway
                              Judge

Decided:  April 17, 2007
                New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

SAN VICENTE CAMALU SPR DE RI,                :

                             *Plaintiff*,        :

                    v.                         :

UNITED STATES,                               :        Court No. 02-00811

                             *Defendant*,        :

                    and                        :

CAADES SINALOA, A.C., *et al.*,              :

                    *Defendant-Intervenors*.    :

_____

## JUDGMENT

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record, and in accordance with the Court's opinion of this date, it is hereby

ORDERED that Plaintiff's motion is denied; and it is further

ORDERED that the U.S. Department of Commerce's determination suspending the resumed antidumping investigation of fresh tomatoes from Mexico, published at Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico, 67 Fed. Reg. 77,044 (Dec. 16, 2002), is sustained; and it is further

ORDERED, ADJUDGED, and DECREED that this action be, and hereby is, dismissed.

_____
                    /s/
                    Delissa A. Ridgway
                    Judge

Dated:  April 17, 2007
        New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____        By: _____
                                            Deputy Clerk